

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One St. Andrews Plaza*
*New York, New York 10007*

October 25, 2021

**By ECF**

The Honorable Kimba M. Wood
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

            Re:     United States **v.** Jonathan Roper, S3 16 Cr. 542 (KMW)

Dear Judge Wood:

       Jonathan Roper is scheduled to be sentenced by Your Honor at 11 a.m. on Monday, November 8, 2021. The Government respectfully submits this letter to advise the Court of the pertinent facts concerning the substantial assistance Roper provided in the investigation and prosecution of others.

       As he admitted during his plea proceeding and his testimony at the trial of *United States v. Gordon Freedman*, 18 Cr. 217 (KMW), Roper, as a sales representative and then manager at the pharmaceutical company Insys Therapeutics, Inc., participated in a deeply corrupt scheme to bribe doctors to prescribe Insys's fentanyl-based drug, Subsys. But Roper also provided substantial and valuable assistance to the Government in its investigation and prosecution of other individuals involved in that scheme, particularly the five doctors who were charged and convicted in the *Freedman* matter: Alexandru Burducea, Gordon Freedman, Jeffrey Goldstein, Todd Schlifstein, and Dialecti Voudouris. Given these facts, and assuming that Roper continues to comply with the terms of his cooperation agreement, the Government intends to move, pursuant to Section 5K1.1 of the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") and 18 U.S.C. § 3553(e), that the Court sentence him in light of the factors set forth in Section 5K1.1(a)(1)-(5) of the Guidelines.

     **I.**     **Offense Conduct**

       As detailed in the Pre-Sentence Investigation Report revised May 4, 2020 ("PSR"), Roper worked in sales at Insys from March 2013 until December 2015. He began as a sales representative assigned to promote Subsys to Freedman, Goldstein, and Schlifstein, among others. In September 2013, he became a district sales manager, making him responsible for supervising numerous sales representatives—including codefendant Fernando Serrano—and a

sales territory that included Manhattan. From July 2015 through December 2015, Roper was promoted again, this time to the position of field sales director. During his time at Insys, Roper participated in the conspiracy to pay bribes and kickbacks, in the form of fees for purported speaker programs, to induce doctors to prescribe Subsys. (PSR ¶ 29).

### A. <u>Subsys and the Insys Speakers Bureau</u>

Fentanyl is a synthetic opioid approximately 50 to 100 times more potent than morphine. It is classified as a Schedule II controlled substance under the Controlled Substances Act, meaning that it has a high potential for abuse. (PSR ¶ 32).

In January 2012, the U.S. Food and Drug Administration (the "FDA") approved Subsys, a fentanyl spray administered sublingually (i.e., under the tongue), for the management of breakthrough pain in cancer patients who were already receiving and tolerant to opioid therapy for their underlying persistent cancer pain. The Subsys label expressly warned against prescribing the drug to patients who were not already opioid tolerant, "[d]ue to the risk of fatal respiratory depression." In March 2012, Subsys entered the commercial market. (PSR ¶ 31).

Unlike some fentanyl-based medications, such as transdermal patches, Subsys is in a category of drugs known as Transmucosal Immediate Release Fentanyl ("TIRF") products, which are rapid-onset opioids designed to treat breakthrough pain in opioid-tolerant adults with cancer. Because of the risk of misuse, abuse, and addiction associated with TIRF products, including Subsys, practitioners must enroll in an FDA program known as the Transmucosal Immediate Release Fentanyl Risk Evaluation and Mitigation Strategy program (the "TIRF REMS Program") and complete required training and testing in order to prescribe Subsys and other TIRF products for outpatient use. Patients, too, must enroll in the TIRF REMS Program in order to be prescribed TIRF products, including Subsys. (PSR ¶ 33).

In August 2012, Insys established the Insys Speakers Bureau, a roster of doctors and other health care providers paid purportedly to provide educational presentations, known as speaker programs, about Subsys. Rather than recruit potential speakers based on their qualifications as educators, Insys targeted speakers who would be willing to prescribe Subsys in large volumes. Insys executives instructed sales representatives to focus their time and resources on a few doctors and offer them lucrative speaker fees, among other benefits, in exchange for prescribing high quantities of Subsys. After the Speakers Bureau launched, Insys executives tracked and circulated statistics documenting speakers' prescribing habits. For a time, Insys calculated each speaker's "ROI"—return on investment—by dividing the sales generated from the practitioner's Subsys prescriptions by the amount Insys had paid that practitioner in speaker fees. (PSR ¶¶ 21, 48).

### B. Roper's Participation in the Conspiracy

#### 1. Hiring and Training at Insys

Roper applied for a job as a sales representative with Insys around February 2013, after seeing the job listed on the job-search website Monster.com. Roper was working as a sales supervisor at a small toy company at the time, making roughly $45,000 annually. He had no experience with pharmaceuticals or anything related to medicine or healthcare. He interviewed with an Insys sales executive, Alec Burlakoff, and a sales manager, Jeffrey Pearlman. Roper said during the interview that he had attended some college but did not have a degree. The interviewers told Roper to list a college degree on his application anyway, and Roper did so. (Tr. 280-82).[1]

Shortly after he was hired around March 2013, Roper was flown to Insys headquarters in Arizona for training, where he met most of Insys's senior management. Burlakoff and others lectured Roper and other new hires about how to market Subsys effectively. They urged the new sales representatives to recruit doctors who wanted to be paid to conduct speaker programs, and displayed statistics showing that the company's top sales representatives worked with prescribers who were speaking on a weekly basis. Roper understood from the training that he should recruit doctors to speak in order to induce those doctors to prescribe Subsys. One woman attending the training questioned the propriety of linking payment of speaker fees to a speaker's prescriptions; when the training ended, she was fired. (Tr. 284-85).

#### 2. March 2013-Sept. 2013: Tenure as an Insys Sales Representative

Roper hit the field in late March 2013. At the direction of Burlakoff and Pearlman, who had just been promoted from the job Roper was hired to do, Roper focused on trying to sell to two particular doctors in his territory, Gordon Freedman and another physician ("Doctor-1"). Doctor-1 was already a paid Insys speaker, but she was not prescribing large quantities of Subsys. Roper attended some of Doctor-1's speaker programs, which occurred during lunchtime at the hospital where Doctor-1 worked. Doctor-1 gave educational lectures to an audience of medical professionals during those programs. Roper urged Doctor-1 to prescribe more Subsys, explaining that more prescriptions were needed to justify the speaker fees. Doctor-1 responded that she would not prescribe Subsys unless she thought it would help her patients. Her prescriptions did not increase, so Insys stopped paying her to speak. (Tr. 285-89).

Roper found more success with Freedman, who was also already a paid Insys speaker. During his time as a sales representative, Roper attended a Freedman speaker program roughly once per week. Freedman's speaker programs differed markedly from Doctor-1's. The programs were held at fancy restaurants, and involved little to no education about Subsys. Few other doctors or healthcare professionals even attended the dinners, and those who did attend had little reason to be there, whether because Subsys was not relevant to their field or because they had previously attended other Subsys speaker programs. At times, nobody attended at all—a problem, because Insys policies required at least two healthcare professionals to attend in order

---

[1] "Tr." refers to the transcript from Freedman's trial.

to justify paying the speaker. As a result, Roper, following instructions he received from his supervisor, routinely falsified sign-in sheets to foster the illusion that an appropriate audience had heard Freedman speak about Subsys. (Tr. 289-96, 345-60).

Meanwhile, Roper cultivated an additional speaker, Jeffrey Goldstein. Around late March or early April 2013, Roper visited Goldstein's office and raised the possibility of nominating Goldstein to the Insys speakers bureau. Goldstein was interested, and he promptly began prescribing far more Subsys than he had previously. Pleased with Goldstein's sudden eagerness to prescribe Subsys, Roper nominated Goldstein to be an Insys speaker on April 12, 2013. In May 2013, Goldstein signed an agreement with Insys promising him a fee of $1,000 per speaker program. Meanwhile, Goldstein's Subsys prescriptions continued to rise. Goldstein, who had written just eight Subsys prescriptions before April 2013, prescribed Subsys 97 times from April 2013 through September 2013. During the same period, he was the designated speaker at 12 programs, for which he collected total fees of $12,000. (PSR ¶¶ 62-64; Tr. 358-60). As he did with respect to Freedman's speaker programs, Roper often falsified sign-in sheets for Goldstein's programs, which were rarely legitimate educational events.

Thanks largely to prescriptions written by Freedman and Goldstein, Roper became one of Insys's highest-earning sales representatives by the third quarter of 2013. (Tr. 360-75).

### 3. Sept. 2013-June 2015: Tenure as an Insys Sales Manager

Roper was promoted to be a district sales manager in September 2013. In that role, he supervised approximately 10 Insys sales representatives in New York City and elsewhere in the Northeast.

At the beginning of each quarter, Insys allocated a set number of speaker programs that doctors in Roper's sales district would be entitled to hold. Roper was responsible for deciding which doctors would conduct—and be paid for—those programs. Roper made these decisions based on the doctors' prescribing patterns. Consistent with his training and the directions he received from his superiors, Roper viewed the programs as a way to induce doctors to prescribe more Subsys, and he allocated speaker programs accordingly. (PSR ¶ 49).

Roper also conveyed to his subordinates the importance of using lucrative speaker fees to generate higher prescription totals from their assigned doctors. Roper openly instructed sales representatives that speaker programs would be allocated only to high prescribers of Subsys, and he emphasized that if doctors who received speaker fees failed to prescribe sufficient Subsys, they would be dropped from the speakers bureau. Roper urged sales representatives to pass the same message along to their assigned doctors. For example, when Roper felt that Voudouris was prescribing insufficient Subsys to justify her speaker fees, he expressed his displeasure to codefendant Fernando Serrano, who was the Insys sales representative assigned to Voudouris. (PSR ¶¶ 50-51). Roper knew that many of the speaker programs conducted during his tenure as a sales manager—like many of the ones he attended as a sales representative—were essentially social outings with no educational component. Roper understood that the purpose of the speaker programs was not to educate doctors, but rather to reward high prescribers. In his view, Insys's willingness to hold far more speaker programs than its competitors was a business advantage.

As a sales manager, Roper helped recruit new Insys speakers, including Burducea, Schlifstein, and Voudouris, while continuing to interact with Freedman and Goldstein. When necessary, Roper made clear to the speakers that they needed to prescribe high volumes of Subsys in order to receive speaker fees. For example, Roper and Insys sales executives decided to cut back on the number of speaker programs allocated to Schlifstein in 2014 because they believed Schlifstein was not prescribing Subsys in sufficient quantities. Schlifstein received the message; he increased his prescriptions, and was rewarded with additional speaker programs and higher fees per program. (PSR ¶¶ 90-94). Similarly, Roper hired Burducea's girlfriend to be an Insys sales representative in order to induce Burducea to prescribe Subsys, and he helped make Burducea a speaker once it became clear that Burducea would prescribe high volumes of the drug in return. (PSR ¶¶ 97-107). And Roper had an explicit conversation with Voudouris about the need to prescribe more Subsys if she wanted to continue collecting purported speaker fees. (Indictment No. 18 Cr. 217, at ¶ 117).

Before and after becoming a sales manager, Roper took steps to reward high prescribers of Subsys even beyond the fees for participating in the speakers program. For example, he took Goldstein to casinos and nightclubs and attended Rangers games with Freedman, charging all of the expenses to Insys. (PSR ¶ 68; Tr. 398-402).

### 4.     July 2015-Dec. 2015: Tenure as an Insys Sales Director

Roper was promoted again around July 2015, around the same time that Insys's program of paying lucrative speaker fees to high prescribers attracted increased scrutiny. Insys cut back its speakers program dramatically in response, and began instituting stricter compliance measures. In December 2015, Roper was terminated—according to Insys, as part of a restructuring of the company.

### II.    Procedural History, Guidelines Calculation, Forfeiture, and Restitution

Roper was arrested on June 9, 2016, and charged by Complaint, along with Serrano, with one conspiracy and one substantive count of violating the Anti-Kickback Statute. (Dkt. 1). On August 9, 2016, an initial indictment charged Roper with those same offenses. (Dkt. 12). On August 18, 2017, Roper appeared before the Honorable William H. Pauley III, waived indictment, and pleaded guilty, pursuant to a cooperation agreement, to Counts One through Five of Superseding Information S3 16 Cr. 542 (the "Information"). (PSR ¶ 9). Count One charged Roper with conspiracy to violate the Anti-Kickback Statute by participating in the Insys scheme from March 2013 through December 2015. Count Two charged him with a substantive violation of the Anti-Kickback Statute for the same conduct. Count Three charged him with wrongfully obtaining individually identifiable health information in violation of Health Insurance Portability and Accountability Act (HIPAA), based on his review of patient medical information to assess whether patients would be good candidates to be prescribed Subsys. Count Four charged him with conspiracy to commit honest services fraud, based on his participation in the conspiracy to bribe doctors and thus deprive patients of their intangible rights to their doctors' honest services. Count Five charged Roper with aggravated identity theft, based on his and others' use of names

and national provider identifier (NPI) numbers for healthcare professionals whose names were forged onto sign-in sheets for speaker programs they had not attended.

The Government concurs with the Probation Department's calculation of the applicable Sentencing Guidelines. (*See* PSR ¶¶ 124-45, 207). The total offense level is 28, based on a base offense level for the fraud offense of 7 because the statutory maximum term of imprisonment is at least 20 years, *see* U.S.S.G. § 2B1.1(a)(1); a 22-level enhancement because the estimated loss resulting from the offenses was $30,868,001, which exceeds $9.5 million but does not exceed $25 million,[2] *see* U.S.S.G. § 2B1.1(b)(1)(L); a 2-level enhancement because Roper was convicted of a federal health care offense involving loss of at least $1 million to a federal health care program, *see* U.S.S.G. § 2B1.1(b)(7)(A) and (b)(7)(B)(i); and a 3-point reduction for Roper's acceptance of responsibility, *see* U.S.S.G. § 3E1.1. Because Roper has three criminal points, he is in Criminal History Category II. Accordingly, the Guidelines range is 87 to 108 months' imprisonment, to be followed by a mandatory and consecutive 24-month prison term under the aggravated identity theft statute.

Pursuant to his cooperation agreement, Roper admitted the forfeiture allegations against him with respect to Counts One, Two, and Four of the Information. The Government intends to seek forfeiture based on an estimate of the sales commissions and bonuses Roper was paid while working at Insys as a result of prescriptions written by coconspirators; the Government is still working to determine the appropriate total, and plans to submit a proposed forfeiture order before sentencing. Based on the Court's opinion and order denying the Government's request for restitution in matter No. 18 Cr. 217 (*see* Dkt. 306), the Government does not intend to seek restitution from Roper.

### III.     Roper's Cooperation and Substantial Assistance

Roper began providing information to the Government on July 19, 2017, while charged in a superseding indictment for his role in the Insys scheme. That was the first of a string of proffer sessions Roper attended leading up to his guilty plea on August 18, 2017. Though Roper minimized his culpability at times during his early sessions with the Government, he took complete responsibility before entering into his cooperation agreement. Roper then complied with his obligations under the cooperation agreement in full. In the Government's view, he provided truthful and complete information about his own and others' conduct. He met with the Government whenever his presence was requested. And he provided substantial assistance in the Government's investigation and prosecution of Burducea, Freedman, Goldstein, Schlifstein, and Voudouris, including by providing information that contributed to the Government's decision to charge all five doctors; by testifying over two trial days at Freedman's trial; and by providing additional information that enabled the Government to identify and obtain evidence from other witnesses.

---

[2] The estimated loss total is based on the net sales Insys earned from Subsys prescriptions written by coconspirator doctors or other medical professionals Roper interacted with either directly as a sales representative, or indirectly as a manger or supervisor of other sales representatives assigned to the coconspirator prescriber.

Hon. Kimba M. Wood
October 25, 2021
Page **7** of **10**

Section 5K1.1 of the Guidelines sets forth five non-exclusive factors that sentencing courts are encouraged to consider in determining the appropriate sentencing reduction for a defendant who has rendered substantial assistance. *See* U.S.S.G. § 5K1.1(a). The application of each of those factors to Roper's cooperation is set forth below.

### A. Significance and Usefulness of the Defendant's Assistance (U.S.S.G. § 5K1.1(a)(1))

Roper's assistance was undoubtedly valuable and substantial. Roper contributed meaningfully to the investigations and successful prosecutions of all five doctors charged in matter No. 18 Cr. 217:

- With respect to Burducea, Roper provided helpful background and context about Insys's efforts to recruit Burducea to be a paid speaker. Roper confirmed that Insys's senior management understood that it was hiring Burducea's then-girlfriend (and later wife) to be an Insys sales representative assigned to Burducea, meaning that she collected a commission for every Subsys prescription Burducea wrote. Information from Roper undermined Burducea's false claims, in answering questions when he was approached by the FBI, about the timing of his relationship with the sales representative. Thus, Roper's information contributed to the Government's decision to charge Burducea with making false statements, among other offenses.

- With respect to Freedman, Roper provided considerable information about the lack of education and sham nature of Freedman's speaker programs as early as 2013. At the time Roper began cooperating, other witnesses, like Serrano, were available to testify about the sham nature of Freedman's programs later in time. But Roper's involvement as early as March or April 2013 proved that Freedman's speaker programs lacked education essentially from the outset. Roper provided the names of various doctors and other witnesses who could attest to the non-educational nature of the programs, or who agreed to sign sign-in sheets for Freedman programs that they had in fact never attended. Roper also disclosed that he had asked Freedman to attend sign-in sheets for speaker programs that Freedman had never attended, a fact that demonstrated Freedman's knowledge of the misrepresentations on the sign-in sheets. Indeed, Roper testified at trial about Freedman falsely signing a sign-in sheet from a purported speaker program hosted by Goldstein. (Tr. 358-60). Roper also disclosed, and testified at trial about, conversations in which he urged Freedman to try to increase his Subsys prescriptions but putting more patients on the drug, to which Freedman responded, in essence, that he would see what he could do and it was not a problem. (Tr. 394).

- With respect to Goldstein, Roper provided significant additional incriminating evidence beyond the substantial evidence the Office already had already developed against Goldstein when Roper began cooperating. Roper was responsible for recruiting Goldstein as an Insys speaker, and confirmed that many of Goldstein's early speaker programs involved no educational component, again showing that the

- programs were essentially a sham designed to conceal bribes paid in exchange for prescriptions. Roper described various significant expenses that Insys paid for Goldstein's benefit, including a holiday party for Goldstein's medical office and outings at casinos. Most significantly, Roper revealed that he had had direct conversations with Goldstein about how the financial relationship with Insys affected Goldstein's prescribing habits, including conversations Goldstein's decision to prescribe a Subsys competitor drug to his patients in an effort to extract higher payments from Insys.

- With respect to Schlifstein, Roper provided helpful background and context about Insys's efforts to recruit Schlifstein as a paid speaker, including the role of Insys executive Sunrise Lee, who was convicted in the District of Massachusetts for her role in the scheme. Roper described an explicit conversation he had with Schlifstein about the need to prescribe Subsys in order to obtain purported speaker fees. Roper disclosed that, at the direction of Burlakoff, he had told Schlifstein at one point that Burlakoff was concerned that Schlifstein was prescribing Subsys in insufficient quantities, and Schlifstein's efforts to alert Insys that Schlifstein was responsible for Subsys prescriptions that were signed by his assistance.

- With respect to Voudouris, Roper corroborated the accounts of two other witnesses who had described an explicit discussion Insys personnel had with Voudouris about the need to prescribe Subsys in exchange for speaker payments, an offer Voudouris readily accepted. Roper also described a follow-up conversation in which he told Voudouris bluntly that she was expected to prescribe more Subsys given that she was being allocated so many speaker programs, and he corroborated Serrano's accounts of that discussion and similar events that followed. That corroboration was critical to show that Voudouris engaged in a corrupt *quid pro quo* agreement with Insys.

It is possible that each of the five defendants discussed above would have been charged and prosecuted successfully even without Roper's cooperation. It is a certainty, however, that Roper's assistance made the Government's charging decisions far easier and its case against each defendant far stronger. It is no coincidence that four of the five defendants entered guilty pleas, and the fifth, Freedman, did not bother to appeal his conviction at trial.

    **B.**    **Truthfulness, Completeness, and Reliability of any Information or Testimony (U.S.S.G. § 5K1.1(a)(2))**

In the Government's view, Roper provided truthful and candid information during proffer sessions and from the witness stand at trial. Roper minimized his culpability at times during his initial proffer sessions, in particular by deflecting responsibility for his own illegal conduct onto his superiors at Insys. To be clear, the Government does not believe that Roper provided any false information about his superiors (who were indeed culpable) or anyone else; rather, the issue was that Roper was slower than he could have been in recognizing his own bad conduct. But within a short period, and weeks before he entered into the cooperation agreement, Roper turned the corner and took responsibility for his own bad acts. A willingness to disclose facts that reflect poorly on one's own conduct is a hallmark of effective cooperation, and Roper did not shy away

from revealing facts that cast himself in a negative light, including details about the felony conviction he sustained while serving in the Air Force (PSR ¶¶ 140-43) and lies he had told on job applications. Moreover, Roper was forthcoming and credible at all times when providing information about other people. Where related evidence was gathered from other sources, including from written records and testimony of other cooperating witnesses, that evidence corroborated Roper's statements, a strong indication that Roper was neither minimizing nor exaggerating accounts of what others had done.

   C.  **Nature and Extent of the Defendant's Assistance (U.S.S.G. § 5K1.1(a)(3))**

  Roper met with the Government approximately 17 times over the course of his cooperation, a total that includes the initial proffer sessions in July and August 2017 and numerous in-person meetings with the Government between Roper's guilty plea and his trial testimony. He also voluntarily turned over and consented to having the Government search his cellphone and laptop. He cooperated not only by providing historical information that advanced the investigations of the five doctor defendants and contributed to the Government's decision to charge all five, but also by testifying over two days at Freedman's trial. Moreover, as recently as January 2020, Roper agreed to provide information to another prosecutor's office in connection with an investigation. Roper met with the Government every time his presence was requested, and was willing to continue cooperating had the Government requested that he do so.

   D.  **Any Injury Suffered, or Any Danger or Risk of Injury to the Defendant or His Family Resulting from His Assistance (U.S.S.G. § 5K1.1(a)(4))**

  Neither Roper nor his family has faced any physical danger as a result of his cooperation. But the process of cooperating in this case has not been easy. Roper acknowledged, both to the Government in proffer sessions and to the public during trial, that he participated in an egregious scheme involving a powerful and dangerous opioid. At Insys, he had enjoyed wealth and trappings far beyond what he had ever experienced. In admitting his guilt, he acknowledged that his success had been built on a corrupt bargain he and others at Insys struck with unscrupulous doctors. Although Roper is responsible for his own actions and decisions, he deserves credit for participating in a cooperation process that required him to admit publicly and be cross-examined about his conduct.

   E.  **Timeliness of the Defendant's Assistance (U.S.S.G. § 5K1.1(a)(5))**

  Roper began cooperating with the Government on July 19, 2017. By then, Serrano had already entered into a cooperation agreement, and other witnesses who ultimately entered into non-prosecution agreements had begun cooperating, as well. But Roper's assistance was timely with respect to the investigations of Burducea, Freedman, Goldstein, Schlifstein, and Voudouris, all of whom were charged based at least in part by information obtained from Roper. And from July 19, 2017 forward, as noted above, Roper assisted and met with the Government whenever his cooperation was requested.

Hon. Kimba M. Wood
October 25, 2021
Page **10** of **10**

## IV.  Conclusion

The Government has determined that Roper provided substantial assistance in the investigation and prosecution of others. The Government therefore expects to request at sentencing, pursuant to Section 5K1.1 of the Guidelines and 18 U.S.C. § 3553(e), that the Court sentence him in light of the factors set forth in Section 5K1.1(a)(1)-(5).

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:   */s/*
Noah Solowiejczyk
David Abramowicz
Assistant United States Attorneys
Southern District of New York
(212) 637-2473/6525

cc:    Joseph Ferrante, Esq. (by ECF)